**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**CHATTANOOGA**


SHARON A. COFFMAN,          )
                                  )
       Plaintiff,          )
                                  ) Civil Action No. 1:15-CV-242-CHS
v.                           )
                                  )
CAROLYN W. COLVIN,       )
Acting Commissioner of      )
Social Security,           )
                                  )
       Defendant.       )

<u>**MEMORANDUM OPINION**</u>

## I.    INTRODUCTION

Plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (herein, "Act") (42 U.S.C. Section 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security. For the reasons stated below, Plaintiff moves that this Court reverse the Commissioner's decision, and remand the claim to the Agency for an award of benefits, or for proper consideration of the evidence. Plaintiff asserts two primary errors: (1) the ALJ improperly failed to accord controlling weight to the opinion of Ms. Coffman's treating physician, Dr. Johnson, and (2) the Appeals Council failed to consider new and material evidence. For the reasons stated herein, the Court finds the ALJ failed to properly evaluate the opinion of the treating physician. The Court also finds the Appeals Council did not err in refusing to consider new and additional evidence. Accordingly, this action is **REMANDED** to the Commissioner under sentence four of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for further proceedings consistent with this opinion.

## II.  FACTS

### A.  Procedural History

Sharon Coffman filed an application for a period of disability and disability insurance benefits on December 28, 2012.  Tr. 220, 235.  Ms. Coffman alleged that her disability began on November 2, 2012, and was due to numerous conditions, including residual effects from 4 major spine surgeries (three cervical and one lumbar), as well as osteoarthritis, fibromyalgia, depression and anxiety, and obesity. Tr. 239, 314, 319.  At the time she became disabled, she was over 50 years old and had worked consistently for the previous 22 years.  Tr. 224.

Ms. Coffman's claim was denied twice by the Agency (Tr. 139-142, 147-149), and she requested a hearing with an administrative law judge ("ALJ").  Tr. 154-155.  On April 27, 2015, Ms. Coffman notified Social Security that she was in dire need because her home was being foreclosed and she would lose shelter.  Tr. 180-185.  Social Security thereafter scheduled her hearing for July 22, 2015, which was held before ALJ Kliner.  Tr. 40-105.

On August 19, 2015, the ALJ issued an unfavorable decision, denying Ms. Coffman's claim for benefits.  Tr. 19-39.  Ms. Coffman immediately requested review of that decision by the Agency's Appeals Council, filing the request on August 26, 2015.  Tr. 15-18.  Nine days later, on September 4, 2015, the Appeals Council denied Plaintiff's appeal, stating that she could ask for court review of the ALJ's decision.  Tr. 10-14.  The denial did not reach plaintiff's counsel until September 10, 2015, and, in view of Ms. Coffman's impending foreclosure, Plaintiff's counsel filed suit in United States District Court on September 18, 2015.  Complaint, Doc. 1.

The matter was complicated, however, because Social Security issued a letter on September 15, 2015 "setting aside" its earlier denial, and granting additional time to provide evidence in support of the appeal, which letter was received by Plaintiff's counsel on September

21, 2015. Tr. 7-9. Plaintiff submitted substantial arguments in support of the appeal on October 8, 2015, Tr. 291-302, but the Appeals Counsel ultimately denied Ms. Coffman's appeal once more on November 19, 2015. Tr. 1-6.

Thus, the ALJ's decision is the final decision of the Agency, Plaintiff has exhausted her administrative remedies, and her claim is properly before this court for judicial review.

**B.      Medical and Factual Evidence**

Ms. Coffman was originally hired as a machine operator at McKee Foods bakery and was later promoted to a supervisory role. Tr. 99. She ended her 22 years of employment with McKee Foods on her alleged onset date, November 2, 2012, and has not worked since then. Tr. 61. The vocational expert's testimony at the hearing identified the supervisor position as light work, performed at the skilled level (though no skills were transferable to sedentary position), while the machine operator job was medium work and unskilled. Tr. 99-100. She graduated from high school and attended, but did not graduate from college. Tr. 57-58.

**1.      Treatment Records**

**a.      Dr. Hodges**

Following an ATV accident, Ms. Coffman originally had cervical surgery in 2006 in which her C3-4 vertebrae were fused. Tr. 660. On November 2, 2012, she saw Dr. Hodges complaining of pain in her neck, arms, back, hips, and shoulder blades. Her pain level was 8 out of 10, with 10 being the highest level possible.[1] Tr. 395-96. A subsequent MRI revealed herniated nucleus pulposus at C3-4, C4-5, C6-7 and mild stenosis at L4-5. Tr. 396. Dr. Hodges recommended removing the hardware placed in her neck in 2006 and replacing it. Tr. 391-402. Dr. Hodges and Dr. Greer performed the revision surgery on February 20, 2013, expanding the

---

[1] Pain levels are based on a scale of 1 to 10 with 10 being the highest. Pain levels will be indicated herein using the following denotation: x/10, meaning "x out of 10," with x being the reported pain level.

fusion to include C3-7.  Tr. 399-401; Tr. 546-549. Foraminal narrowing was noted.  Tr. 399-400. Plaintiff returned to Dr. Hodges on March 6, 2013, for a post-operative visit complaining of shoulder pain and headaches.  Her pain was 2/10.  She reported Flexeril and Percocet were effective in controlling her pain, but that pain intensified by turning her head; it was diminished by lying down.  Tr. 391.  On April 22, 2013, Plaintiff underwent a steroid epidural injection at L4-5 for pain. Tr. 454.

On May 7, 2013, Plaintiff saw Dr. Hodges and reported neck pain, back pain, and bilateral numbness and tingling in legs.  Her pain was 3/10.  Oxycodone was effective in controlling the pain but it intensified with all activity and diminished with rest.  Tr. 451.  X-rays showed moderate osteoarthritis of the hip and pelvis, degenerative scoliosis of the lumbar spine and severely decreased disc height at L3-L4.  Dr. Hodges' impression was lumbar degenerative disc disease, radiculitis stenosis, degenerative osteoarthritis in the hip and myalgia/myositis. Plaintiff is 5' 7" tall and weighed 243 lbs. with a body mass index of 36.78. Tr. 452.

An MRI taken on May 9, 2013, showed moderate degenerative disc disease at L3-4 with left neural foraminal stenosis, mild degenerative disc disease and facet arthropathy at L4-5 producing mild right neural foraminal and neural canal stenosis. Tr. 449.  On May 16, 2013, Plaintiff saw Dr. Hodges again and reported her pain level as 3/10 and that Oxycodone was effective in controlling her pain.  She also stated her pain is intensified by climbing stairs, bending, and stooping and diminished by lying down with a pillow between her knees.  She was walking with a cane.  Waddell signs were negative.  Straight leg raising was negative and motor strength was 5/5 for the lower extremities.  Dr. Hodges' impression was severe degenerative disc disease at L3-4 and no stenosis.  He wrote a note that Plaintiff should be off work for the next six months. Tr. 448-49.

### b.    Dr. Chander

On or about July 12, 2013, Neurologist Dr. Chander noted on examination that Ms. Coffman had difficulty balancing and noted that her EMG/NCS studies revealed right superficial peroneal neuropathy.  Dr. Chander noted that Plaintiff could walk without an assistive device but uses a cane "for safety which is okay with me." Tr. 504, 513.  The cause of the balance problem was "not clear," but could be caused by too many medications – Dr. Chander was not sure.  He noted frequent falls, back pain, degenerative disc disease and possible fibromyalgia.  Tr. 504. Throughout the file she is noted to be significantly obese.  Tr. 493; 841; 873.

### c.    Dr. Hufstutter

Ms. Coffman received treatment from Dr. Huffstutter, a rheumatologist, for her fibromyalgia.  Tr. 473-492, 758-784, 912-923.  On October 1, 2013, Dr. Huffstutter examined Ms. Coffman and noted that she presented with severe symptoms of fibromyalgia.  Tr. 779.  Dr. Huffstutter confirmed the diagnosis of fibromyalgia/fibrositis on November 11, 2014.  Tr. 916. Plaintiff has reported lack of concentration. *See e.g.,* Dr. Hufstutter's records, April 30, 2014, Tr. 762, 914.

### d.    Dr. Gruber - the Laser Spine Institute

On November 6, 2013, she presented to Dr. Gruber of the Laser Spine Institute in Florida for a lumbar evaluation, where he noted that the conservative treatment had given her minimal relief, and that her pain was causing her significant pain and adverse effect on her activities of daily living.  Tr. 693-96.  Dr. Gruber noted ataxic and antalgic gait and abnormal heel-toe walk. Tr. 696.  Plaintiff was using a cane.  Resting pain level was 0-4/10; active pain level was 8-10/10 and she was currently experiencing a pain level of 5-6.  Prolonged sitting, standing, walking, twisting and bending worsened her pain.  Tr. 693.   In the operative report on December 10,

2013, Dr. Gruber noted that Ms. Coffman was significantly limited in her ability to sit, stand and walk: 30 minutes for sitting and 5 to 10 minutes for walking or standing. His physical examination also revealed that her "range of motion is profoundly limited." Plaintiff was using a cane to steady herself. Tr. 649. On December 10, 2013, Dr. Gruber noted Plaintiff had an ataxic and antalgic gait and was unable to heel toe walk. Tr. 687. Lumbar and thoracic flexion was limited and painful. Tr. 687. She reported a pain level of 0-4/10 resting, 8-10/10 active, and 5-8/10 current. Tr. 679. Due to her significant symptoms, and the objectively identified severe degenerative disc disease, Dr. Gruber recommended and performed a lumbar laminectomy on December 10, 2013. Tr. 649-651. His impression was degenerative disc disease and a bulging disc at L3/4 and L4/5, and spinal stenosis and facet degeneration and hypertrophy. Tr. 677. In a follow-up visit on December 13, 2013, Plaintiff complained of headaches and of neck pain radiating into her shoulders and scapula. Her resting pain was 1-3 while her active pain was 8-10. Tr. 660.

Thereafter, Ms. Coffman had a surgical consultation with Dr. Gruber regarding her cervical spine, which she reported continued to be severely painful, caused her headaches, significant weakness, and compromised her ability to care for herself at home. Tr. 660. On December 18, 2013, she had a cervical laminectomy and foraminotomy with decompression of the nerve root at C6-7, her third cervical surgery, which was performed by Dr. Morris. Tr. 652-655. On December 31, 2013 and January 24, 2013, Ms. Coffman followed up with the Laser Spine Institute stating she had no pain improvement in her neck and some improvement in her back. Tr. 745, 749, 750. She was advised to use ice therapy and continue neck exercises as tolerated, follow-up with her primary care physician, and pain management. She was advised to call back for additional MRI's if her symptoms persisted. Tr. 745.

####### e.  Dr. Johnson

Dr. Bruce Johnson practices family medicine and was Plaintiff's primary care physician. From January 16, 2013 to June 1, 2015, Dr. Johnson saw Plaintiff at least 17 times. He treated her for a variety of ailments including low thyroid, hypertension, depression, renal failure, fibromyalgia, and obesity. In almost every visit, he made note of her degenerative disc disease as well as her fibromyalgia. For example, on July 31, 2013, he noted neuralgic pain in Plaintiff's arms and shoulders and lumbar degenerative disc disease. Tr. 853. On August 29, 2013, he noted limited mobility of the lumbar spine and chronic back pain. He referred her for a "laser spinal surgical consultation" due to "persistent spinal stenosis and back pain probably 6 months." Tr. 852. On October 2, 2013, Dr. Johnson noted chronic back related problems secondary to disc disease, awaiting evaluation from "spinal disc laser surgery referral. . . ." Tr. 851. On February 27, 2014, Dr. Johnson noted recent back surgery but "not much improvement". . . "severe joint pain discomfort [sic] severe back pain with limited mobility." Tr. 846. On April 24, 2014 and August 6, 2014, Dr. Johnson noted cervical and lumbar degenerative disc disease. Tr. 845, 842. On December 30, 2013, he noted chronic neck and back pain secondary to disc disease, recent cervical and lumbar disc surgery with continued headaches and "some neck and back pain [sic] will be unable to work until April 30, 2014." Tr. 850. On February 27, 2014, he noted severe back pain and joint pain with limited mobility. Tr. 846. On September 18, 2014, he noted increasing symptoms of chronic back pain and fibromyalgia. Tr. 841. On June 1, 2015, he noted that Plaintiff has had several back surgeries with no improvement of her chronic lumbar pain and was awaiting referral to Vanderbilt for a consultation. Tr. 971.

## f.    Dr. Dreskin - Tennessee Valley Pain Management

Related to her fibromyalgia and multiple surgeries, Ms. Coffman has had consistent pain management treatment from Dr. Dreskin at Tennessee Valley Pain Management (TVPM) from August 3, 2012, until at least May 12, 2015, obtaining treatment approximately every thirty days. *See* TVPM records, Tr. 410-447, 619-648, 785-839, 89-909.    Since November 2012, she has been on a regimen of opioid pain medications.    In November 2012,  she was prescribed Oxycodone 5mg which was added to her prescriptions for, among other medications, Percocet 5 MG, Voltaren,[2] and a Lidoderm patch. Tr. 425.   On August 1, 2013, her pain management specialist added 15 Mg of MS Contin (Morphine) twice per day, to her regimen, while maintaining her prior medications. Tr. 630.   She has continued to be prescribed these medications throughout her treatment with TVPM.  The staff at TVPM took measures to ensure Plaintiff was not abusing her pain medications by conducting regular pill counts of her medications, urine tests, and reviewing records for her filled prescriptions on the website for the Tennessee Controlled Substance Monitoring Program.  No abuse was found.  *See* TVPM records, Tr. 410-447, 619-648, 785-839, 89-909.   On March 6, 2015, her Oxycodone was increased temporarily to 10 mg three times per day due to "increased pain with no relief with her medication." Tr. 879.

While Plaintiff's pain levels have abated on occasion, she has consistently reported significant pain levels notwithstanding her pain medications and surgeries.   She reported to TVPM on the following dates the following pain levels:

-    May 1, 2013: pain level 2-3/10. Tr. 645- 648

-    May 29, 2013, pain level 6/10. Tr. 640-45.

---

[2] Voltaren is a nonsteroidal anti-inflammatory drug used to relieve pain, inflammation, and joint stiffness caused by arthritis.  https://www.webmd.com/drugs/2/drug-54/voltaren-oral/details (last visited on November 15, 2017).

- June 26, 2013, pain level 5/10. Tr. 635-39

- July 24, 2013, pain level 5-6/10. Tr. 630 -34.

- August 22, 2013, pain level 4/10. Tr. 625-28.

- September 18, 2013, pain level 3/10.  Tr. 620-23.

- October 17, 2013, pain level 5-7/10. Tr. 819-22.

- November 21, 2013, pain level 5-7/10. Tr. 816-819.

- December 23, 2013, pain level 6/10.  Tr. 812-816.

- January 23, 2014, pain level, 4/10. Tr. 808-812.

- February 25, 2014, pain level 4/10. Tr. 805-08.

- March 23, 2014, pain level 6/10. Tr. 801-05.

- April 28, 2014, pain level, 5/10. Tr. 797- 01.

- May 27, 2014, pain level 6/10.  Tr. 793-97.

- June 27, 2014, pain level 6/10. Tr. 790-93.

- August 1, 2014, pain level 7/10. Tr. 786-90.

- September 2, 1014, pain level 7/10. Tr. 905-08.

- September 30, 2014, pain level 6/10.  Tr. 900-05.

- October 28, 2014, pain level 6/10. Tr. 895-00.

- November 24, 2014, pain level 4/10. Tr. 890-95.

- December 22, 2014, pain level 4-6/10. Tr. 885-90.

- January 27, 2015, pain level 5-6/10. Tr. 880-85.

- March 6, 2015, pain level 8/10. Tr. 875-80.

- March 20, 2015, pain level 6-7/10. Tr. 870-75.

- April 15, 2015, pain level 7/10.  Tr. 865-70.

-     May 12, 2015, pain level 5/10.  Tr. 861-65.

In every one of these instances, TVPM noted that Plaintiff's pain improves with medication, but worsens with activity.  On several occasions, the record has explicitly indicated that such activity includes "prolonged sitting and standing."  *See e.g.,*  Tr. 620, 625, 635.  In nearly each of these instances at TVPM, upon physical examination, Plaintiff was found to have tenderness and reduced range of motion in neck, shoulders, and back, and tenderness in multiple trigger points, reduced muscle strength and an irregular gait.  In about half of her visits, it was determined she could not heel walk or toe walk and straight leg raising was positive for both legs. *See* citations above.

### 2.    Counseling Records

The administrative record indicates she received an evaluation and counseling for depression on September 14, 2014 and March 9, 2015.  Tr. 856, 857, 931.  After the first visit, her therapist gave her a GAF of 45.  Tr. 857.  She reported to the therapist constant pain due to her medical problems.  On March 9, 2015, three days after she reported to TVPM a spike in her pain level to 7/10 and was prescribed a temporarily higher dose of Oxycodone, Plaintiff reported to the therapist that her pain level was better since her medication had changed but she was still having 2 to 3 migraines a week.  Tr. 931.  Plaintiff stated she was grieving her job loss.  Tr. 931.

### 3.    Plaintiff's Testimony and Function Reports

Plaintiff testified about her daily activities and her limitations at the hearing before the ALJ.  Plaintiff testified that despite her medication, she could understand what was occurring in the hearing and was "not worried at all" about her ability to understand.  Tr. 55-56.  The ALJ asked her counsel if counsel was satisfied that Plaintiff was fully engaged and understanding the proceedings, and counsel stated he was and would notify the ALJ if he became concerned.  Tr.

56.  She is not allowed to drive because she takes Oxycodone and morphine.  Tr. 55.  She testified as follows concerning her daily activities:  She occasionally looks at FaceBook, mainly to see her grandchildren's pictures.  TR. 60.  Her husband does the grocery shopping unless "we're not going to buy big loads of groceries."  She never goes by herself shopping because her husband must drive and she does not pick up anything from a low shelf, her husband does that. Tr. 65.  She uses a cane to help with her balance.  Sometimes she uses a walker that has wheels, a seat and compartments to carry her purse and medicine.  Tr. 66.  She can pick up a gallon of milk if she uses two hands.  She will slide a case of water across the floor but can't lift it.  Tr. 67. If she is looking for only one or two items, she will accompany her husband shopping to Wal-Mart or Bi-Lo.  She estimates she can walk about 150 feet at a time.  She either uses a motorized scooter or walks leaning into the shopping cart handle for support.  Tr. 69-70.  She can sit comfortably about 20 or 30 minutes.  Tr. 70.  Reaching overhead causes her problems and her husband has to help her dress. Tr. 70.  Her medication makes her sleepy and foggy headed.  Tr. 80-1.  She explained her foggy headedness as follows:  When you asked me to raise my right hand and I raised my left hand, it's just kind of weird stuff, you know, like it's like I'm not quite all there kind of, you know."  Tr. 81.   On a good day, she arises about 4 or 5 AM.  Tr. 85.  She fixes a bowl of cereal and eats, and then brushes her teeth.  Tr. 85.  Then she and her husband sit in the living room and have a cup of coffee and watch the news.  Tr. 86.  After about an hour and a half, she gets up and walks a bit and then goes to the bathroom again.  Then she has another cup of coffee.  Tr. 87.  She may go on the patio and sit on a wheeled cart and pull weeds out of a planter for 30 minutes.  Then she reads and watches TV.  Tr. 89-90. She goes to bed around 8 PM.  Tr. 91.  Sometimes her sons come to visit.  Friends do not visit.  Tr. 92-93.  Occasionally her husband drives her to church a mile away. Tr. 94.    In her disability application, Plaintiff

stated she uses a shower chair and long handled brush to shower, and her husband helps her dress. Tr. 285. In a counseling session on March 9, 2015, Plaintiff told her therapist that her "sister is going through a divorce and she went down to Florida to help her over the past three weeks." Tr. 931. There was no elaboration regarding the "help" she rendered.

In her function report dated May 14, 2013, Plaintiff stated she uses a walker or cane to get around because she has had several falls. Tr. 250. Her husband helps her bathe and wash her hair. Tr. 250. She "seldom ever" makes meals. Tr. 251. When she does, she "can make something in the microwave." Tr. 251. She tries to help by folding towels and tries to pick up after herself. Tr. 251. The Social Security Function Report Form asks the claimant to check all boxes that apply for the question, "If you do any shopping, do you shop: In stores, By phone, By mail, By computer." Tr. 250. Plaintiff indicated that "seldom" she shops in stores, by phone, and by computer for "necessities, birthday gifts for immediate family, Rx." Tr. 252. She also indicated she "seldom" shops at Wal-Mart for incontinence pads and grooming items. She uses the buggy for support, all items are located in the same area, and she can finish and get back to the car within one hour. Tr. 252. Her husband does all the grocery shopping. Tr. 252.

### 4. Assessments

#### a. Dr. Sweets

On June 8, 2013, Dr. Thomas Sweets performed a single consultative examination on Ms. Coffman. He found that she had marked limitations in her cervical range of motion and limited range of motion in numerous other areas. Tr. 469. Dr. Sweet stated it was "pretty obvious" that Plaintiff did not need her cane, despite finding her obesity "does appear to make it a little more difficult for her to walk [and] affect her balance slightly." Tr. 470. Dr. Sweets opined Plaintiff could lift up to 50 pounds 2 to 6 hours/day, carry up to 50 pounds 2 to 6 hours/day, sit 6-8

hours/day, stand 6-8 hours/day and walk 6-8 hours/day. He found she had very few limitations: Plaintiff could lift, push, pull, carry, bend, stoop, and squat and that she had the ability to speak, hear, communicate, and travel.  Tr. 471.

### b.    Dr. Thrush

DDS file-reviewing physician Thrush gave his opinion on February 2, 2014—two months after her lumbar and cervical surgeries—stating that Ms. Coffman would be limited to lifting 20 pounds occasionally, 10 pounds frequently, would have occasional limitations to most postural activities, and would be limited to occasionally reaching overhead bilaterally, providing as explanation for these limitations her December cervical and lumbar surgeries.  Tr. 135-136.

### c.    Dr. Johnson

Dr. Johnson, her longtime treating physician, gave his assessment of her limitations on April 24, 2014.  Dr. Johnson stated she would be unable to attend a full time work schedule; would be limited to lifting 5 pounds occasionally; would require significant breaks, including bed rest; that her extreme pain that would cause her to lose concentration for several hours, three or more days per week; and she would be chronically absent from work.  Tr. 754-757.

### d.    Vocational Expert

Plaintiff's counsel asked the vocational expert whether any one of the following specific restrictions provided in Dr. Johnson's report would preclude all work:

- Being able to work a maximum of three hours per day;

- Requiring bed rest of four hours during the day;

- Severe pain causing lack of concentration for several hours three or more days per week; and

- Chronic Absences of at least three or more days per month.

Tr. 102-103. The vocational expert responded that each one of these restrictions, individually, would preclude all work. Tr. 103.

### C.     The ALJ's Decision

The ALJ used the five step sequential evaluation process for determining whether an individual is disabled. 20 C.F.R. § 404.1520(a). He concluded Plaintiff met the insured status requirements, had not engaged in gainful activity since the alleged on-set date of disability, and that she had severe impairments in the form of cervical disc disease, lumbar disc disease, fibromyalgia, obesity, and post-status arthroscopic knee surgery. Tr. 24. He found she did not have a severe impairment due to depression or anxiety. Tr. 26. The ALJ also found Plaintiff's impairments did not meet or equal the severity of the listing of impairments found in Appendix 1 of 20 C.F.R. Part 404, Subpart P. Tr. 27.

In step five of the sequential evaluation, the ALJ did find Plaintiff had the residual functional capacity (RFC) to perform the full range of "light work," as defined in 20 C.F.R. 1567(b), which equates to an individual who is capable of standing six hours of the day and lifting 20 pounds occasionally. Tr. 27. He found no limitations in concentration, persistence and pace. Tr. 55-56. In examining Plaintiff's claim of disabling pain, the ALJ found that Plaintiff had medically determinable impairments that could reasonably be expected to cause the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible. Tr. 33. Because the ALJ found she could perform a full range of light work, the ALJ also found Plaintiff could perform her previous job as a packing machine supervisor and was, therefore, not disabled.

## III.    Analysis

### A.     Standard of Review

The determination of disability under the Act is an administrative decision. To establish

disability under the Social Security Act, a claimant must establish she is unable to engage in any substantial gainful activity due to the existence of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A); *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). The Commissioner employs a five-step sequential evaluation to determine whether an adult claimant is disabled. 20 C.F.R. §§ 404.1520; 416.920. The following five issues are addressed in order: (1) if the claimant is engaging in substantial gainful activity she is not disabled; (2) if the claimant does not have a severe impairment she is not disabled; (3) if the claimant's impairment meets or equals a listed impairment she is disabled; (4) if the claimant is capable of returning to work she has done in the past she is not disabled; (5) if the claimant can do other work that exists in significant numbers in the regional or the national economy she is not disabled. *Id.* If the ALJ makes a dispositive finding at any step, the inquiry ends without proceeding to the next step. 20 C.F.R. §§ 404.1520; 416.920; *Skinner v. Sec'y of Health & Human Servs.*, 902 F.2d 447, 449-50 (6th Cir. 1990). Once, however, the claimant makes a *prima facie* case that she cannot return to her former occupation, the burden shifts to the Commissioner to show that there is work in the national economy which she can perform considering her age, education and work experience. *Richardson v. Sec'y of Health and Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner made any legal errors in the process of reaching the decision. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (adopting and defining substantial evidence standard in the context of Social Security cases); *Landsaw v. Sec'y of Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Even if there

is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Sec'y, Health and Human Servs.*, 790 F.2d 450 n.4 (6th Cir. 1986).

The court may consider any evidence in the record, regardless of whether the ALJ cited it. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). However, for purposes of substantial evidence review, the court may not consider any evidence that was not before the ALJ. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Furthermore, the court is not obligated to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No. 2:08-cv-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and "issues which are 'adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived,'" *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (quoting *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)).

### B. Discussion

#### 1. The ALJ's Decision Not to Give Dr. Johnson's Opinion Controlling Weight

Plaintiff asserts that, when the ALJ rejected Dr. Johnson's opinion about her RFC, the ALJ erred by failing to follow the treating physician rule and, had the ALJ done so, Plaintiff

properly would have received benefits.

The Regulations require an ALJ to "evaluate every medical opinion" regardless of its source. 20 C.F.R. §§ 404.1527(c), 416.927(c). However, every medical opinion is not treated equally, and the Regulations describe three classifications for acceptable medical opinions: (1) nonexamining sources; (2) nontreating sources; and (3) treating sources. A nonexamining source is "a physician, psychologist, or other acceptable medical source who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. §§ 404.1502, 416.902.[3] A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.* Finally, the Regulations define a "treating source" as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id.*; *accord Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

An ALJ is required to give a treating source's medical opinion "controlling weight" if: "(1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R. § 404.1527(c)(2)); *West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 696 (6th Cir. 2007). If the ALJ does not give a treating source's opinion controlling weight, she must determine the appropriate weight to give the opinion based

---

[3] The Social Security Administration revised its rules regarding the evaluation of medical evidence. 82 Fed. Reg. 5844-01, 2017 WL 168819. The revised regulations went into effect on March 27, 2017, *id.*, and are not applicable to this case. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642 (6th Cir. 2006) ("The Act does not generally give the SSA the power to promulgate retroactive regulations.").

on the length, frequency, nature, and extent of the treatment relationship; the treating source's area of specialty; and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)-(6)); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (internal citations omitted). A failure to give "good reasons," or a failure to determine the degree of deference owed to a non-controlling treating source opinion, "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record," and requires remand. *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) (per curiam) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007)).

In this case, the ALJ stated the following as explanation for why he gave Dr. Johnson's opinion no weight:

> I find Dr. Johnson's opinion is overly broad and unsupported by the claimant's physical examination records, objective imaging, reported activities of daily living, and record as a whole. To that end, the claimant reported independence for self-help activities except that she required assistance to get in and out of the shower and utilized a chair while showering (Exhibit 11F). In her adult function report, the claimant stated that she prepared simple meals; tried to pick up after herself; helped with the laundry by folding towels; and shopped in stores, by phone, and on the computer (Exhibit 4E). Moreover, the claimant reported she traveled to Florida and had been taking care of her sister who was going through a divorce for the prior three weeks on March 9, 2015. She stated her pain level had been better since her medications had changed (Exhibit 32F). Based upon the foregoing and the record as a whole, I give Dr. Johnson's opinion little weight.

Tr. 31.

The ALJ did not elaborate further on his reasons for rejecting Dr. Johnson's opinion. The ALJ did not did not specifically explain how Dr. Johnson's opinion was unsupported by the physical examination records and the objective imaging even though he had previously stated, "[a]fter careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. . . ." Tr. 33. This

failure to provide specific reasons denotes a lack of substantial evidence and alone requires remand. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007).

The Court finds further error in the ALJ's assessment of Dr. Johnson's opinion. In refusing to give Dr. Johnson's opinion controlling weight, the ALJ also found Plaintiff's subjective complaints of pain and limitations were not credible. The ALJ must give "specific reasons for the finding on credibility, supported by the evidence in the case record," which are "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the [claimant's] statements and the reasons for that weight." Social Security Ruling ("SSR") 96-7p (1996); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247-48 (6th Cir. 2007). According to agency regulations, the ALJ must,

> consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating or nontreating source, and observations by our employees and other persons […] Factors relevant to your symptoms, such as pain, which we will consider include:
> > i.    Your daily activities;
> > ii.   The location, duration, frequency, and intensity of your pain or other symptoms;
> > iii.  Precipitating and aggravating factors;
> > iv.   The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> > v.    Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> > vi.   Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> > vii.  Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

The ALJ found that Plaintiff's reported activities were inconsistent with Dr. Johnson's opinion and with disability and therefore concluded those activities were a basis to discredit her

testimony. Specifically, the ALJ stated Plaintiff reported "independence for self-help activities" by "preparing simple meals," "shopping in stores, by phone, and by computer," "folding towels," and trying to pick up after herself. Tr. 31. The ALJ also noted that she had traveled to Florida to take "care of" her sister who was going through a divorce and "[s]he had stated that her pain level had been better since her medications had changed." Tr. 33. However, the ALJ did not consider Plaintiff's complete reports about these activities. For example, Plaintiff stated she *seldom* shopped and that when she did, she only shopped for a few items, she used a scooter or leaned on the cart handle, and she could walk only about 150 feet. As for simple meals, she poured cereal or heated up food in the microwave. Taking care of her sister after a divorce could simply have meant that she was in Florida to provide emotional support – it does not indicate in any way what physical activities, if any, she undertook to care for her sister. Assuming that "taking care of her sister" during a divorce meant engaging in physical activities inconsistent with disability is speculation. The ALJ could have asked the Plaintiff for more detail about this activity in the hearing but he did not. In fact, none of the activities cited by the ALJ as "inconsistent with disability" are consistent with light work, *i.e.,* the ability to lift 20 pounds up to 2 hours a day, lift ten pounds up to six hours a day, and walk or stand up to six hours out of an eight hour day. *See* 20 C.F.R. 404.1567, SSR 83-10. Even the Commissioner agreed that "Plaintiff's reported activities do not equate to the performance of substantial gainful activity. . . ." Commissioner's brief at 6, Page ID # 1148. Nevertheless, the Commissioner argues that Plaintiff's activities demonstrate Plaintiff is not as disabled as she purports to be and are therefore evidence of her lack of credibility. However, in addition to explicitly stating that these activities were "inconsistent with a finding of disability," Tr. 33, the ALJ did not explain how these activities rebut Plaintiff's assertions of inability to perform specific activities she said she

could not perform.  Interestingly, the ALJ appears to have credited her statement that she needed help getting in and out of the shower and utilized a chair while showering, Tr. 31, 33, limits which are entirely inconsistent with an inability to lift 20 pounds up to 2 hours a day and to walk/stand up to six hours a day.  It is also consistent with the Plaintiff's asserted limitations on her ability to stand and walk for lengthy periods of time and her asserted need to use a cane for balance – an assertion supported by neurologist Dr. Chander's treatments records as well as the treatment records from TVPM which uniformly noted an ataxic and antalgic gait upon physical exam over a nearly two year period.

The ALJ also did not adequately consider the duration, frequency, and intensity of her pain or the precipitating factors.  The ALJ specifically noted two occasion when Plaintiff reported a fairly low pain level, Tr. 29 (level 3), Tr. 31 (low level); the ALJ did not mention her pain levels if they were not supportive of his assessment of light work.  The administrative record contains treatments notes for visits approximately every thirty days over a 22 month period to Dr. Dreskin and his associates at TVPM for management of her pain related to fibromyalgia and her degenerative disc disease.  These records provide a consistent view of Plaintiff's reported pain levels and the opioid medications used to address her pain.  They reveal that Plaintiff frequently reported pain levels of six and above.  While the ALJ mentions Dr. Dreskin's treatment and the fact that Plaintiff reported her pain improved with medication, Tr. 28, he does not mention that Plaintiff always reported her pain level worsened with movement. During the course of her treatment at TVPM, the median reported pain level, without activity, was a 6.  The record shows plaintiff reported significant and consistent pain levels over a nearly two year period. Her pain requires continuous treatment with two opioid medications, and Plaintiff does not appear to have missed any appointments.  There is no hint of malingering by

Plaintiff in the record. There is no evidence that Plaintiff was misusing these medications, and TVPM conducted checks at each visit to ensure she was properly using the medication.

The ALJ also did not adequately consider the side effects of the opioids she takes to alleviate pain. Plaintiff takes two opioid medications consistently. She testified those medications make her foggy and she is not permitted to drive. The ALJ did not seem to factor this into his decision at all, primarily because Plaintiff said she could understand what was occurring in the hearing. However, the ability to focus during a one-time hearing relating to one's disability claim does not translate to the ability to focus consistently, day after day during a 40 hour work week.

The ALJ also discredited Plaintiff's complaints in part because she did not make a follow-up trip to Vanderbilt Hospital for a consultation for her back. However, it is not clear whether the ALJ was aware that the Plaintiff, who was undergoing foreclosure of her home at the time of the hearing, reported to New Beginnings Counseling that she "did not have enough money to even make the trip to Nashville." TR. 968.

The ALJ in rejecting Dr. Johnson's opinion also considered the opinions of one time consultative examiner Dr. Sweets and consultative physician Dr. Thrush. Dr. Sweets, after examining Plaintiff on June 8, 2013, opined Plaintiff could lift and carry 50 pounds 2 to 6 hours a day; sit, stand or walk 2 to 6 hours a day and lift, push, pull, carry bend, stoop and squat. Tr. 471. Based on the objective medical findings available to Dr. Sweets at the time he gave his opinion, *i.e.,* two cervical surgeries (2006 and February 2013), and a finding of severe degenerative disc disease as well as her severe obesity, Dr. Sweets' opinion that this fifty-two year old woman could lift or carry 50 pounds 2 to 6 hours a day defies credulity and casts doubt on the reasonableness of his entire opinion. Because Dr. Sweets did not have the medical

records related to her subsequent December 2013 cervical and lumbar surgeries and subsequent treatment records, including Dr. Hufstutter's records related to fibromyalgia and the subsequent records from TVPM, and Dr. Johnson, the ALJ did not accept Dr. Sweets' 50 pound assessment and limited Plaintiff's ability to lift and carry to 20 pounds occasionally and ten pounds frequently. He did, however, accept the remainder of Dr. Sweets' opinion that Plaintiff could walk, sit and stand six hours out of an eight hours day. The ALJ accepted Dr. Thrush's opinion that she could lift 20 pounds occasionally and ten pounds frequently and could sit, stand, and walk up to six hours a day. The ALJ however rejected Dr. Thrush's opinion that Plaintiff would be limited to bilateral overhead reaching due to degenerative disc disease on the ground that Dr. Thrush did not adequately support this limitation, despite the fact that the Plaintiff has had three cervical surgeries to fuse her vertebrae and the record contains many references to Plaintiff's complaints of pain when reaching overhead.

The Commissioner argues, citing *Helm v. Commissioner of Social Security*, 405 F. App'x 997, 1002 (6th Cir. 2011), that consultative source's opinion need not be based on a complete record; it needs only be supported by substantial evidence. Commissioner's brief at 11, Doc. 22. However, if a state agency medical consultant does not review a complete record, the ALJ must give an indication that he considered this fact before giving the state agency consultant greater weight than the treating physician. *See Gibbens v. Commissioner*, 659 Fed. App'x 238, 248 (6th Cir. 2016) ("Where a non-examining source did not review a complete case record, we require some indication that the ALJ at least considered these facts before giving greater weight to that opinion.") While the ALJ declined to accept Dr. Sweets' assessment that Plaintiff could lift 50 pounds two to six hours a day because Dr. Sweets did not have subsequent medical records evincing significant treatment for severe degenerative disc disease and pain, the ALJ failed to

explain why these subsequent records had no bearing on Dr. Sweets' assessment that Plaintiff could walk, sit, or stand six hours in an eight hour day.

For the reasons stated, the Court therefore concludes the ALJ did not adequately and fully consider those factors listed in Section 404.1529(c)(3) when discrediting Plaintiff's subjective complaints of pain to conclude that Dr. Johnson's opinion was not supported by the evidence as a whole. This finding is an separate and independent basis for remand.

### B.    The Appeals Counsel's Refusal to Consider Additional Evidence

Plaintiff contends the Appeals Council erred by receiving, but failing to consider or exhibit additional evidence submitted in support of Plaintiff's argument that Dr. Sweets' examination report and opinion should be given no weight.  According to Plaintiff's counsel, Dr. Sweets assigns the same opinion to every person he examines.  Tr. 315-316.  At the hearing, the Plaintiff attempted to introduce three consultative reports prepared by Dr. Sweets for three other claimants – all with different conditions, ages, gender, and sizes; nevertheless, Dr. Sweets gave the same RFC to them as he did for the Plaintiff in this case: the ability to lift and carry 50 pounds frequently and sit, walk, and stand throughout the day.  Subsequently, after the ALJ issued his decision, the Plaintiff attempted to introduce for the Appeals Council's review, two additional opinions from Dr. Sweets with the same "stock" opinion about two more claimants' abilities for the purpose of showing that "Dr. Sweets' opinions, including Ms. Coffman's, is a cookie cutter opinion wholly divorced from any real findings made at the examination and whose RFC is essentially boilerplate that is copied from report to report."  Plaintiff's brief at 25, Doc. 14.  The Appeals Council refused to add the new material into the record on the ground that it applied to other claimants.

Review by the courts under 42 U.S.C. § 405(g) is confined to the evidence that was before the Commissioner at the time of her decision. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir.1988). Where a plaintiff submits additional evidence to the Appeals Council, the Appeals Council will consider the evidence only if it is (1) new, (2) material, and (3) related to the period on or before the date of the ALJ's decision. *See* 20 C.F.R. § 404.970(b). Similarly, although evidence attached to a plaintiff's brief may form the basis for remand under section 405(g), the plaintiff must show that the evidence is new and material and that she had good cause for failing to submit it to the ALJ. *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993); *see also Moore v. Comm'r of Soc. Sec.*, 573 F. App'x 540, 544 (6th Cir. 2014) (unpublished). Plaintiff bears the burden of showing that remand is proper. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (citing *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986)).

The Court finds the records relating to Dr. Sweets to be of some concern, especially since his opinion that Plaintiff can lift and carry 50 pounds 2 to 6 hours a day is wholly unsupported by the record in this case. Nevertheless, claimants are not permitted to submit records from other claimants' cases for the purpose of showing bias on the part of an examiner – to do so "would substantially burden the social security disability hearings process because it would most certainly result in mini-trials of unrelated and irrelevant claims." *Hepp v. Astrue*, 511 F.3d 798, 805 (8th Cir. 2008). Consequently, the Court concludes the Appeals Council did not err in refusing to consider the opinions offered by Dr. Sweets in other claimants' cases.[4]

---

[4] The Court does note, however, that the Social Security regulations provide a mechanism to challenge an examiner on the basis of bias and have a new examiner assigned to the claimant pursuant to 20 C.F.R. § 404.1519j.

## V. CONCLUSION

For the reasons stated herein, the motion of the Commissioner is **DENIED** and the motion of the Plaintiff is **GRANTED** as follows: the decision of the Commissioner is **REVERSED** and this action is **REMANDED** to the Commissioner pursuant to sentence four of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

s\ *Christopher H. Steger*
UNITED STATES MAGISTRATE JUDGE